IN RE NOWAK ET AL.

[Cite as *In re Nowak,* 104 Ohio St.3d 466, 2004-Ohio-6777.]

(No. 2004–0272—Submitted September 29, 2004—Decided December 17, 2004.)

ALICE ROBIE RESNICK, J.

{¶ 1} This case comes to us as a certified question of state law from the Bankruptcy Appellate Panel of the United States Sixth Circuit Court of Appeals, pursuant to S.Ct.Prac.R. XVIII. The panel has certified the following facts to us:

{¶ 2} "Debtors, Michael and Christine Nowak, executed a mortgage on real estate that they owned in favor of [petitioner] P[CF]S Financial (Provident Bank) on March 6, 1998. On March 20, 2001, the Debtors filed a chapter 7 bankruptcy case. The chapter 7 trustee [respondent Lydia Spragin III] filed an adversary proceeding under § 544(a) and (b)(1) of the Bankruptcy Code seeking to avoid the mortgage of PCFS Financial. Following a hearing, the bankruptcy court found that the mortgage had not been properly attested by two witnesses as required by [former] Ohio Rev.Code § 5301.01 and then held that [former] Ohio Revised Code § 5301.234 was unconstitutional.

{¶ 3} "* * * The bankruptcy court thus held that the mortgage could be avoided by the chapter 7 trustee notwithstanding [former] Ohio Revised Code § 5301.234 * * *."

{¶ 4} In addition to the certified facts, it is undisputed that the Nowaks' mortgage had been recorded but had been executed in the presence of only one witness and covers property located at 4931 Shady Brooke Run, Medina, Ohio.

{¶ 5} The panel has certified the following question for our determination:

{¶ 6} "Does [former] Ohio Revised Code § 5301.234 violate Ohio Constitution Article II, § 15(D), which states:

{¶ 7} " 'No bill shall contain more than one subject, which shall be clearly expressed in its title. No law shall be revived or amended unless the new act contains the entire act revived, or the section or sections amended, and the section or sections amended shall be repealed.' "

{¶ 8} For the reasons that follow, we answer the certified question in the affirmative.

# I

## BACKGROUND

{¶ 9} In order to provide a clear perspective of the current issue, we begin our analysis with a brief description of the interplay between federal bankruptcy law and Ohio mortgage law that surrounded the enactment of former R.C. 5301.234.

{¶ 10} The certified issue arises out of the panel's attempt to determine whether respondent is entitled to avoid the Nowaks' mortgage under Section 544(a)(3), Title 11, U.S.Code, which involves a mixture of federal and state law. Section 544(a)(3) enables a bankruptcy trustee to avoid any transfer of the debtor's property that would be avoidable by a hypothetical bona fide purchaser. See *In re Zaptocky* (C.A.6, 2001), 250 F.3d 1020, 1023–1024. However, Section 544(a)(3) provides the trustee with the rights and powers of a bona fide purchaser of real property "without regard to any knowledge of the trustee." The federal courts have interpreted this language to mean that the trustee's ability to avoid a particular transfer of the debtor's property cannot be defeated by evidence of his or her actual knowledge of the transfer. Id. at 1027. See, also, *In re Sandy Ridge Oil Co., Inc.* (C.A.7, 1986), 807 F.2d 1332, 1334–1336. Thus, the critical inquiry under Section 544(a)(3) is whether the trustee, standing in the place of a bona fide purchaser, would be charged with constructive knowledge of the transfer sought to be avoided. "Since this mortgage concerns real property located in Ohio, this inquiry is governed by Ohio law." *In re Zaptocky*, 250 F.3d at 1024.

{¶ 11} As a matter of Ohio law, a bona fide purchaser of real property cannot be charged with constructive knowledge of a prior unrecorded mortgage. R.C. 5301.25; *Emrick v. Multicon Builders, Inc.* (1991), 57 Ohio St.3d 107, 109, 566 N.E.2d 1189; *Thames v. Asia's Janitorial Serv., Inc.* (1992), 81 Ohio App.3d 579, 587, 611 N.E.2d 948. Before the enactment of former R.C. 5301.234, this rule encompassed recorded mortgages that were defectively executed under former R.C. 5301.01, which provided, "The [mortgagor's] signing shall be acknowledged

* * * in the presence of two witnesses, who shall attest the signing and subscribe their names to the attestation." S.B. No. 114, 145 Ohio Laws, Part I, 1034, 1037. Since only properly executed mortgages were entitled to be recorded, a mortgage attested by only one witness, even though recorded, could not serve as constructive notice to a subsequent bona fide purchaser. See *Citizens Natl. Bank v. Denison* (1956), 165 Ohio St. 89, 94–95, 59 O.O. 96, 133 N.E.2d 329; *Amick v. Woodworth* (1898), 58 Ohio St. 86, 50 N.E. 437, paragraph two of the syllabus; *Thames* at 588, 611 N.E.2d 948; *State ex rel. Puthoff v. Cullen* (1966), 5 Ohio App.2d 13, 15–16, 34 O.O.2d 61, 213 N.E.2d 201. Consequently, bankruptcy trustees were able to avoid recorded Ohio mortgages that contained fewer than two attesting signatures. See, e.g., *In re Baker* (Bankr.N.D.Ohio 2003), 300 B.R. 298, 303–304; *In re Haviaras* (N.D.Ohio 2001), 266 B.R. 792, 796; *In re Zaptocky*, 250 F.3d at 1027–1028.

{¶ 12} Former R.C. 5301.234 was the first measure designed by the General Assembly to address this problem. Enacted as part of Am.Sub.H.B. No. 163, 148 Ohio Laws, Part I, 960, 1043–1044, effective June 30, 1999, former R.C. 5301.234 provided:

{¶ 13} "(A) Any recorded mortgage is irrebuttably presumed to be properly executed, regardless of any actual or alleged defect in the witnessing or acknowledgment on the mortgage, unless one of the following applies:

{¶ 14} "(1) The mortgagor, under oath, denies signing the mortgage.

{¶ 15} "(2) The mortgagor is not available, but there is other sworn evidence of a fraud upon the mortgagor.

{¶ 16} "(B) Evidence of an actual or alleged defect in the witnessing or acknowledgment on the mortgage is not evidence of fraud upon the mortgagor and does not rebut the presumption that a recorded mortgage is properly executed.

{¶ 17} "(C) The recording of a mortgage is constructive notice of the mortgage to all persons, including without limitation, a subsequent bona fide purchaser or any other subsequent holder of an interest in the property. An actual or alleged defect in the witnessing or acknowledgment on the recorded mortgage does not render the mortgage ineffective for purposes of constructive notice."

{¶ 18} Former R.C. 5301.234 solved the avoidance problem by allowing the recording of a defectively executed mortgage to serve as constructive notice to subsequent bona fide purchasers. It did not, however, repeal or change the execution requirements under former R.C. 5301.01. Instead, former R.C. 5301.01 and 5301.234 coexisted from June 30, 1999, until February 1, 2002, when R.C.

5301.234 was repealed and R.C. 5301.01 was amended.[1]   2001 Am.Sub.H.B. No. 279.

{¶ 19} Since former R.C. 5301.234's enactment, the federal courts have considered two objections to its application that are relevant to this case.   One objection questions the validity of the statute's enactment under Section 15(D), Article II of the Ohio Constitution.   The two federal courts that have addressed this issue have concluded that the statute was enacted in violation of the one-subject rule. *In re Huffman* (C.A.6, 2004), 369 F.3d 972; *In re Barkley* (Bankr.N.D.Ohio 2001), 263 B.R. 553.   This court declined to answer the question when it was first certified to us in *Hunter v. First Union Home Equity Bank* (2001), 94 Ohio St.3d 1406, 759 N.E.2d 784.

{¶ 20} The other objection concerned the application of former R.C. 5301.234 to mortgages that were recorded prior to the statute's effective date.   The federal courts were divided on this issue.   Some concluded that the General Assembly did not intend the statute to apply to mortgages executed or recorded prior to the statute's effective date.   See, e.g., *In re Farrell* (Bankr.S.D.Ohio 2001), 269 B.R. 181, 185, fn. 2; *In re Caldwell* (Bankr.S.D.Ohio 2000), 257 B.R. 241, 244–245. Other courts held that former R.C. 5301.234 was applicable to mortgages recorded before its effective date, but only in bankruptcy cases filed after its effective date.   See *In re Zaptocky*, 250 F.3d at 1028, fn. 5; *In re Haviaras*, 266 B.R. at 797–799 (discussing both the General Assembly's intent and the constitutional proscription against the passage of retroactive laws in Section 28, Article II of the Ohio Constitution); *In re Stewart* (Bankr.S.D.Ohio 2000), 256 B.R. 259 (considering only legislative intent).

{¶ 21} The latter question reached this court by way of certification in *In re Stewart*, 96 Ohio St.3d 67, 2002-Ohio-3526, 771 N.E.2d 250.   Aside from an introductory procedural statement, our entire opinion in that case reads as follows:

{¶ 22} "The panel certified the following question:

{¶ 23} " 'Can Ohio Revised Code § 5301.234 be applied to presume the validity of a mortgage in a bankruptcy case filed after the effective date of the statute, when the mortgage at issue in the bankruptcy case was recorded before the statute's effective date?'

{¶ 24} "The certified question is answered in the affirmative."

---

1.   No issue has been raised in this case with regard to the applicability of the present version of R.C. 5301.01.   But, see, *In re Baker,* 300 B.R. 298 (holding that the version of R.C. 5301.01 that took effect on February 1, 2002, could not be applied in a bankruptcy case commenced prior to that date).

{¶ 25} According to petitioner and supporting amici, our affirmative response to the certified question in *Stewart* implies a negative response to the present certified question. Although the certified question in *Stewart* makes no reference to the one-subject rule, they argue that in order to give an affirmative answer to the retroactivity question, we necessarily had to determine that R.C. 5301.234 was validly enacted.

{¶ 26} Aside from the fact that this court does not decide constitutional questions in so cryptic a fashion, the panel's certification order in *Stewart* belies the theory that the present certified question was implicitly determined in that case. Immediately after posing the question to be answered, the panel's order of certification in *Stewart* specified, "The parties in the captioned cases did not raise the constitutionality issue [that was certified in *Hunter*, supra, i.e., whether the inclusion of R.C. 5301.234 in Am.Sub.H.B. No. 163 violates the one-subject provision]. The question being certified by this Panel assumes, without deciding, that the statute is constitutional and raises the issue of how the statute is to be applied under Ohio law."

{¶ 27} Thus, our decision in *Stewart* does no more than support the conclusion that in bankruptcy cases filed on or after June 30, 1999 (the effective date of former R.C. 5301.234), former R.C. 5301.234, if constitutional, could be applied to mortgages recorded prior to June 30, 1999. It does not, however, support the conclusion that former R.C. 5301.234 was validly enacted, which brings us to the present certified question.

## II

## ONE–SUBJECT RULE

{¶ 28} For the past century and a half, this court has struggled to define its role in the enforcement of the one-subject provision of Section 15(D), Article II of the Ohio Constitution. In so doing, the court has been fairly straightforward in delineating the history, purpose, and scope of the one-subject provision but has not been as forthcoming in characterizing its nature. Instead, the court has over the years ascribed both mandatory and directory qualities to the rule and promoted the anomalous concept of a directory provision that operates with invalidating force. Consequently, petitioner is able to assuredly claim that "[t]he one subject provision of Article II, § 15(D) of the Ohio Constitution is still directory in nature," while respondent asserts with equal confidence that "[t]he one-subject rule is no longer directory." It is high time that we clarified this matter.

{¶ 29} The one-subject provision was incorporated into the Constitution of 1851 as an integral part of the efforts of the Second Constitutional Convention to rein in the inordinate powers that were previously lodged in the General Assembly and to ultimately achieve a proper functional balance among the three branches of our state government. As we explained in *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 495, 715 N.E.2d 1062:

{¶ 30} "The one-subject rule was added to our Constitution in 1851. It was one of the proposals resulting from the efforts of the Second Constitutional Convention, of 1850–1851. See Kulewicz, The History of the One–Subject Rule of the Ohio Constitution (1997), 45 Cleve.St.L.Rev. 591, 591–593. The genesis of support for this rule had its roots in the same concerns over the General Assembly's dominance of state government that formed the most significant theme of the Constitution of 1851. These concerns, illustrated earlier in this opinion, resulted in the placement of concrete limits on the power of the General Assembly to proceed however it saw fit in the enactment of legislation. The one-subject rule is one product of the drafters' desire to place checks on the legislative branch's ability to exploit its position as the overwhelmingly pre-eminent branch of state government prior to 1851."

{¶ 31} The rule derives in part from the prevailing antipathy toward the manner and means by which the General Assembly exercised its pre–1851 power to enact special laws. By virtue of this power, the General Assembly "became heavily involved in the subsidization of private companies and the granting of special privileges in corporate charters. The General Assembly passed a number of Acts * * * designed to loan credit or give financial aid to private canal, bridge, turnpike, and railroad companies. * * * The public began to bemoan the taxes imposed on them for the benefit of private companies and the losses incurred by the state when subsidized corporations failed." Id., 86 Ohio St.3d at 464, 715 N.E.2d 1062. Concurrently, special charters or bills of incorporation were often assured passage through a system of logrolling, i.e., the practice of combining and thereby obtaining passage for several distinct legislative proposals that would probably have failed to gain majority support if presented and voted on separately. Id. at 495–496, 715 N.E.2d 1062. In limiting each bill to a single subject, the one-subject rule strikes at the heart of logrolling by essentially vitiating its product.

{¶ 32} In its early cases, however, the court took the position that the one-subject rule was not intended to affect the validity of legislative acts and, therefore, was not judicially enforceable. Thus, in the seminal case of *Pim v. Nicholson* (1856), 6 Ohio St. 176, 1856 WL 35, paragraph one of the syllabus, the court held:

{¶ 33} "The provision in the constitution * * * that 'no bill shall contain more than one subject, which shall be clearly expressed in its title,' was incorporated into the constitution, for the purpose of making it a permanent rule of the houses, and to operate only upon bills in their progress through the general assembly. It is directory only, and the supervision of its observance must be left to the general assembly."

{¶ 34} The court's holding that the one-subject provision was "directory only" was tempered, however, by the following caveat:

{¶ 35} "We are therefore of the opinion, that in general the only safeguard against the violation of these rules of the houses, is their regard for, and their oath to support the constitution of the state. We say in general the only safeguard: for whether a manifestly gross and fraudulent violation of these rules might authorize the court to pronounce a law unconstitutional, it is unnecessary to determine. It is to be presumed that no such case will ever occur." Id., 6 Ohio St. at 180.

{¶ 36} In retrospect, these two competing statements are the ultimate source of the present and longstanding confusion over the nature of the one-subject rule. The confusion lies specifically in the court's persistent failure over the years to appreciate what should have been painfully obvious from the outset—these two statements are incongruous.

{¶ 37} A directory provision, by definition, involves no invalidating consequence for its disregard. Indeed, the inability of a directory provision to effectuate an invalidating consequence is its sole defining characteristic. Thus, as the court succinctly explained in *State ex rel. Atty. Gen. v. Covington* (1876), 29 Ohio St. 102, 117, "The difference between a mandatory and directory provision is this, and nothing more: the former avoids, the latter does not." In other words, "an objection that [a directory provision was] not observed will be unavailing in the courts," while "a failure to observe [a mandatory provision] will render the statute void." *Ex Parte Falk* (1885), 42 Ohio St. 638, 639, 1885 WL 59. See, also, Black's Law Dictionary (8th Ed.2004) 493 (defining the term "directory provision" as "[a] statutory * * * sentence or paragraph in which a directory requirement appears," and defining "directory requirement" as "[a] statutory * * * instruction to act in a way that is advisable, but not absolutely essential—in contrast to a mandatory requirement").

{¶ 38} Since the sine qua non of a directory provision is the absence of an invalidating consequence for its disregard, there can be no such thing as a directory provision of vitiating capability. Once this distinction is understood, it becomes evident that the holding and caveat in *Pim* cannot logically coexist, since each operates to the exclusion of the other. If the one-subject provision is directory (as *Pim* holds), it cannot be applied to avoid offending legislation, no

matter how blatant or egregious the violation. On the other hand, if a blatant violation of the one-subject rule can potentially cause an enactment to be invalidated (as *Pim* cautions), the rule cannot be considered directory. The proposition that the one-subject rule is both directory and potentially capable of being applied by the court to invalidate a law is essentially an oxymoron.

{¶ 39} Nevertheless, when the court revisited the matter over a hundred years later in *State ex rel. Dix v. Celeste* (1984), 11 Ohio St.3d 141, 11 OBR 436, 464 N.E.2d 153, it combined *Pim*'s holding and caveat in a single syllabus, which stated:

{¶ 40} "The one-subject rule contained in Section 15(D), Article II of the Ohio Constitution is merely directory in nature; while it is within the discretion of the courts to rely upon the judgment of the General Assembly as to a bill's compliance with the Constitution, a manifestly gross and fraudulent violation of this rule will cause an enactment to be invalidated. (*Pim v. Nicholson*, 6 Ohio St. 176, approved and followed, and extended; *State, ex rel. Attorney General, v. Covington*, 29 Ohio St. 102, paragraph seven of the syllabus, modified.)"

{¶ 41} Seemingly unaware of the obvious contradiction in affixing the directory label to a rule that was being held to have invalidating force, the court in *Dix* endeavored to explain that both aspects of its holding were necessary in order to achieve an appropriate balance between two competing considerations. On the one hand, the court reasoned that "by holding that the one-subject rule is directory and not mandatory, judicial interference with legislative action is reduced" and "appropriate respect [is accorded] to the General Assembly, a coordinate branch of the state government." *Dix*, 11 Ohio St.3d at 144, 11 OBR 436, 464 N.E.2d 153. On the other hand, the court explained that "[t]he primary and universally recognized purpose of [one-subject] provisions is to prevent logrolling," id at 142, 11 OBR 436, 464 N.E.2d 153, and that although the court had "consistently expressed its reluctance to interfere with the legislative process, it [would] not * * * abdicate in its duty to enforce the Ohio Constitution." Id. at 144, 11 OBR 436, 464 N.E.2d 153.

{¶ 42} The court then offered the following evaluation of its holding:

{¶ 43} "This holding strikes the proper balance. It recognizes the necessity of giving the General Assembly great latitude in enacting comprehensive legislation by not construing the one-subject provision so as to unnecessarily restrict the scope and operation of laws, or to multiply their number excessively, or to prevent legislation from embracing in one act all matters properly connected with one general subject. It further recognizes that there are rational and practical reasons for the combination of topics on certain subjects. It acknowledges that the combination of provisions on a large number of topics, as long as they are germane to a single subject, may not be for purposes of logrolling but for the

purposes of bringing greater order and cohesion to the law or of coordinating an improvement of the law's substance.

{¶ 44} "At the same time, this holding provides a sufficient guard against logrolling and stealth and fraud in legislation by stating that a manifestly gross and fraudulent violation of the one-subject provision will render an enactment invalid. For, when there is an absence of common purpose or relationship between specific topics in an act and when there are no discernible practical, rational or legitimate reasons for combining the provisions in one act, there is a strong suggestion that the provisions were combined for tactical reasons, *i.e.*, logrolling. Inasmuch as this was the very evil the one-subject rule was designed to prevent, an act which contains such unrelated provisions must necessarily be held to be invalid in order to effectuate the purposes of the rule." Id., 11 Ohio St.3d at 145, 11 OBR 436, 464 N.E.2d 153.

{¶ 45} The court's holding in *Dix* does, indeed, strike the proper balance, but not because it characterizes the one-subject rule as directory. It strikes the proper balance because it provides that only "a manifestly gross and fraudulent violation of this rule will cause an enactment to be invalidated." It is this portion of its holding alone that accomplishes the goals so eloquently described by the court. Its initial characterization of the one-subject rule as "merely directory in nature" serves only as a source of confusion.

{¶ 46} Once the court had held that a blatant violation of the one-subject rule will cause an enactment to be invalidated, it could no longer legitimately claim that the rule is directory in nature. By continuing to characterize the rule as directory, the court was essentially stating that the validity of an enactment is dependent upon its compliance with a rule that cannot be applied to invalidate an enactment. The stated reason for engaging this fiction, however, was to prevent unwarranted judicial intrusion into legislative affairs. In other words, the court believed that it could not achieve the laudable goal of judicial noninterference in the legislative process if it were to hold the one-subject rule to be mandatory in nature. But the court's own analysis belies that belief, for it specifically observed that "[w]hile Ohio is the only state which holds its one-subject provision to be directory rather than mandatory, other states have achieved the laudable aim of judicial non-interference in the legislative process by holding that their one-subject constitutional provisions should be liberally construed or that they should be construed so as not to hamper the legislature or to embarrass honest legislation." Id., 11 Ohio St.3d at 144, 11 OBR 436, 464 N.E.2d 153.

{¶ 47} Thus, while the court in *Dix* convincingly demonstrated that it needed to devise a holding that would enable the court to fulfill its constitutional duty to enforce the one-subject provision and, at the same time, afford sufficient protection against judicial meddling in legislative affairs, it failed to appreciate that both

of these goals were met by its single holding that only "a manifestly gross and fraudulent violation of this rule will cause an enactment to be invalidated."

{¶ 48} In its post-*Dix* decisions, the court began to intuitively recognize that the holding in *Dix* had done something of a fundamental nature to belie the notion that the one-subject rule is directory rather than mandatory. Yet the court has never been able to pinpoint that that something lies in the fact that *Dix* made observance of the one-subject rule necessary to the validity of legislation. And because of this failure, the court continues to equivocate somewhat on the issue, although it has been moving ever closer to a clear recognition of the rule as mandatory.

{¶ 49} Thus, in *Hoover v. Bd. of Franklin Cty. Commrs.* (1985), 19 Ohio St.3d 1, 6, 19 OBR 1, 482 N.E.2d 575, the court stated, "The court of appeals held that no enactment may be attacked on this basis [that the original bill contained more than one subject], as the 'one-subject' provision of Section 15(D) has been consistently viewed as merely directory rather than mandatory. We disagree and reverse." Justice Holmes, concurring separately, argued that Ohio should finally join the other states and hold its one-subject rule mandatory while interpreting it "so as not to hamper the legislature by making the laws unnecessarily restrictive in their scope and operation. * * * This standard is an accurate interpretation of the provision[ ] as written and also provides the legislature with some latitude to enact comprehensive legislation." Id. at 8, 19 OBR 1, 482 N.E.2d 575 (Holmes, J., concurring).

{¶ 50} Yet in *State ex rel. Hinkle v. Franklin Cty. Bd. of Elections* (1991), 62 Ohio St.3d 145, 147, 580 N.E.2d 767, which is the first case in which this court invalidated a statute on the basis of the one-subject rule, the court returned to the contradictory rhetoric of *Dix*:

{¶ 51} "We have held that the one-subject rule in· Section 15(D), Article II is 'merely directory in nature' and that courts have discretion 'to rely upon the judgment of the General Assembly as to a bill's compliance with the Constitution.' * * * However, we have also held that an enactment will be invalidated due to a 'manifestly gross and fraudulent violation of this rule.' "

{¶ 52} Then, in *Simmons–Harris v. Goff* (1999), 86 Ohio St.3d 1, 15, 711 N.E.2d 203, the court eschewed its "pre-*Dix* holdings, virtually total deference to the General Assembly," and explained that "[d]espite the 'directory' language of *Dix*, the recent decisions of this court make it clear that we no longer view the one-subject rule as toothless. * * * The one-subject rule is part of our Constitution and therefore must be enforced." See, also, *State ex rel. Ohio Civ. Serv. Employees Assn., AFSCME, Local 11, AFL–CIO v. State Emp. Relations Bd.,* 104 Ohio St.3d 122, 2004-Ohio-6363, 818 N.E.2d 688, ¶ 29.

{¶ 53} As Judge Baird astutely observed in his dissenting opinion in *Simmons–Harris*, "[T]here are now, in effect, three categories of constitutional provisions governing the General Assembly: 'directory,' 'mandatory,' and 'directory but [capable of avoiding an act that is] determined by a court to contain more than one subject.'" *Simmons–Harris*, 86 Ohio St.3d at 20, 711 N.E.2d 203 (Baird, J., concurring in part and dissenting in part). Today, we eliminate this anomalous third category.

{¶ 54} We hold that a manifestly gross and fraudulent violation of the one-subject provision contained in Section 15(D), Article II of the Ohio Constitution will cause an enactment to be invalidated. Since the one-subject provision is capable of invalidating an enactment, it cannot be considered merely directory in nature.

{¶ 55} In so holding, we do not attenuate or otherwise impugn the integrity of the manifestly-gross-and-fraudulent-violation standard. We simply obviate the need to explain how the validity of an act can be made to depend upon its compliance with a provision that is merely directory in nature. Beyond this, our holding today does nothing to change any of the principles or standards that have been developed in *Dix* and its progeny.

{¶ 56} With these principles in mind, we now consider whether the General Assembly violated the one-subject rule by including former R.C. 5301.234 in Am.Sub.H.B. No. 163.

## III

## CONSTITUTIONALITY OF FORMER R.C. 5301.234

{¶ 57} We recently held in *State ex rel. Ohio Civ. Serv. Employees Assn.*, supra, that Am.Sub.H.B. No. 405 violated the one-subject rule by including an amendment to R.C. 3318.31, which exempted employees of the Ohio School Facilities Commission from the Public Employees Collective Bargaining Act. In finding that there was no common purpose or relationship between the budget-related items in the bill and the amendment to R.C. 3318.31, we explained:

{¶ 58} "Similar to the statute at issue in *Simmons–Harris*, the amendment to R.C. 3318.31 was an extremely small portion of Am.Sub.H.B. No. 405, which can be loosely described as an appropriations bill. The bill consists of 226 pages, of which the amendment to R.C. 3318.31 is but a single sentence. Surrounding that sentence are over 100 different provisions of law, including provisions that provide property-tax exemptions for Edison program grantees, modify Local Government Fund and Tobacco Master Settlement Agreement Fund distributions, expand use of the Corporate and Uniform Commercial Code Filing Fund, revise provisions of the TANF Housing Program within the Department of

Development, authorize transfers from the Budget Stabilization Fund to the General Revenue Fund, and reduce the cigarette tax discount." Id., 104 Ohio St.3d 122, 2004-Ohio-6363, 818 N.E.2d 688, ¶ 32.

{¶ 59} Am.Sub.H.B. No. 163 is also a sizable bill, of which R.C. 5301.234 is a small part. It consists of 172 pages, contains 31 sections, and amends, enacts, or repeals over 50 sections of the Ohio Revised Code. Of course, disunity of subject matter, not aggregation, is the polestar in assessing a violation of the one-subject rule. But the 24 lines of the bill that constitute the enactment of R.C. 5301.234 appear cryptically between provisions covering aviation and construction certificates for major utility facilities on one side and regulations for the Department of Transportation on the other, which are themselves surrounded by a host of provisions that involve topics ranging in diversity from liquor control to foodstamp trafficking and compensation for county auditors, none of which bears any relation to a mortgage-recording law.

{¶ 60} The bill contains no title descriptive of its subject matter, although it does purport, among other things, "to make appropriations for programs related to transportation and public safety for the biennium beginning July 1, 1999, and ending June 30, 2001, and to provide authorization and conditions for the operation of those programs." Even the proponents of Am.Sub.H.B. No. 163's constitutionality have experienced considerable difficulty in attempting to articulate a rational connection between those programs and the recording of mortgages. In fact, petitioner has not even attempted to devise a single subject that would be broad enough to encompass such diverse matter. Instead, the only explanation that petitioner has been able to provide for the General Assembly's incorporating R.C. 5301.234 into a bill that relates primarily to transportation and public safety is "legislative fine tuning of existing enactments," which simply means, as petitioner explains, that "HB 163 contains many provisions regarding a great deal of subjects that the legislature must address."

{¶ 61} In *In re Barkley*, 263 B.R. 553, the Attorney General attempted to argue that R.C. 5301.234 and the other provisions in Am.Sub.H.B. No. 163 are germane to a single subject because they generally implicate an individual's ownership interest in property, both personal and real. Id. at 560. The court rejected this argument, however, finding it to be both overly broad and inaccurate. Id. We find the bankruptcy court's analysis in *Barkley* to be illuminating and worth quoting at length:

{¶ 62} "This Court's examination of Bill Number 163 and the resulting § 5301.234 reveals no commonality of subject matters. The bill contains provisions in the following titles of the Ohio Revised Code: State Government (4 provisions); Counties (3); Municipal Corporations (1); Criminal Procedure (3); Liquor (5); Motor Vehicles (13); Public Utilities (1); Roads and Highways (15);

and Taxation (3). Section 5301.234 was the only provision that related to Real Property. The provisions in the Counties title address the regional transit board, the regional transit authority, and suits against county officials—statutes that clearly do not bear relation to a mortgage recording law. Likewise, the sections of the Bill that concerned Motor Vehicles had no relation to the recording of mortgages. They addressed disposition of monies from vehicle registration, highway safety, privacy of personal information, renewal of vehicle registration, driver's license examinations, and the issuance of certificates of registration. A search of all other provisions of the Bill for commonality to § 5301.234 is similarly unfruitful.

{¶ 63} "* * * Section 1, the most voluminous of the Bill's sections, is untitled. That section alone enacts or amends statutes concerning: appointment of peace officers, the public employees' retirement and compensation fund, a regional transit authority, compensation of county auditors, police and firemen's pension funds, seizure of property by law enforcement, liquor control enforcement, the highway safety salvage and exchange fund, privacy of information obtained by the registrar of motor vehicles, fees charged by the registrar of motor vehicles, the process for applying for an automobile's certificate of title, a registrar rental fund, automobile insurance, creation of an aviation office in the division of transportation assistance, transfer of title of aircrafts, the duties of the department of transportation, creation of divisions within the department of transportation, the duties of the department of public safety, food stamp trafficking, expedition of special transportation projects, excise taxes, and finally the mortgage recording provision at bar.

{¶ 64} "Section 2 of the Bill simply repeals a set of enumerated statutes. Those provisions repealed are from the following titles: State Government, Counties, Municipal Corporations, Crimes Procedure, Liquor, Motor Vehicles, Public Utilities, Roads, and Taxation. Section 3 very briefly appropriates money for all appropriation line items in the Bill. Section 4 is entitled 'DOT Department of Transportation,' and consists entirely of appropriations for that agency. Section 5 of House Bill Number 163 is similarly titled 'DHS Department of Public Safety.' It too is strictly appropriation for the named department. Likewise, Section 6 provides monies for 'DEV Department of Development.' Finally, Section 7 is the provision of appropriations for 'PWC Public Works Commission.'

{¶ 65} "Section 8, untitled, establishes accounting principles for the Director of Budget and Management. The title to Section 9 is 'Lease Payments to OPFC [Ohio Public Facilities Commission], OBA [Ohio Building Authority], and Treasurer.' Section 10 is untitled, but authorizes a study regarding the need for further resources in local construction. Also untitled is Section 11, which requires a report to the Department of Transportation regarding a comprehen-

sive implementation plan for warranties. Section 12 mandates the submission of a report from the Ohio Rail Development Commission. The Bill's thirteenth section concerns receipt of benefits by the Public Employee Retirement System.

{¶ 66} "Sections 14 and 16 concern the requirements of financial responsibility within the Registrar of Motor Vehicles. Section 15 simply repeals 'section 3 of Am.Sub.S.B. 20 of the 120th General Assembly.' The Bill creates a Task Force on Motor Vehicle Titling to investigate changes made possible by new technology in Section 17. Section 18 authorizes the governor to execute a deed in the name of the state conveying land to one named individual. The nineteenth section amends the Watercraft Certificates of Title Act. Sections 20, 25, 26, 27, and 28 instruct which provisions of the Bill do and do not require referenda. The sections numbered 21, 22, 23 and 24 implement a new application procedure for a certificate of title for an automobile.

{¶ 67} "* * *

{¶ 68} "Section 5301.234 lacks a common purpose or relationship with the balance of Bill Number 163. There is no discernible reason for combining the provisions into one bill. * * * Section 5301.234 presents a classic violation of the one-subject rule, and must be held constitutionally infirm." (Citations omitted.) Id., 263 B.R. at 559–560. See, also, *In re Huffman,* supra, 369 F.3d at 974–975.

{¶ 69} Petitioner argues, however, that this court should adopt a two-part test for determining whether an act should be invalidated as violative of the one-subject rule. Under this test, which is similar to the approach suggested by the dissenters in *Simmons–Harris,* 86 Ohio St.3d at 20, 711 N.E.2d 203, the court would first determine whether there is an absence of common purpose or relationship between specific topics in an act. If the act is found to contain unrelated provisions, the court would then inquire as to whether the disunity was actually the result of logrolling.

{¶ 70} Under the second prong of petitioner's test, disunity in subject matter would not be fatal to the validity of any act that does "not contain highly charged political issues," involve "high profile legislation," or embody "any provisions that would have a great deal of political opposition." The theory is that such innocuous legislation is unlikely to provoke the tactics of logrolling. Thus, disunity of subject matter would be excused where the challenged enactment is not particularly controversial. We emphatically reject this approach.

{¶ 71} Section 15(D), Article II provides that "[n]o bill shall contain more than one subject * * *." Petitioner is essentially asking us to uphold the constitutionality of bills that contain more than one subject, so long as there is no other evidence of logrolling. However, as we explained in *Dix*: "The one-subject provision attacks logrolling by disallowing unnatural combinations of provisions in acts, *i.e.,* those dealing with more than one subject, on the theory that the best

explanation for the unnatural combination is a tactical one—logrolling." Id., 11 Ohio St.3d at 143, 11 OBR 436, 464 N.E.2d 153. In other words, the one-subject provision does not require evidence of fraud or logrolling beyond the unnatural combinations themselves. Instead, "an analysis of any particular enactment is dependent upon the particular language and subject matter of the proposal," rather than upon extrinsic evidence of logrolling, and thus "an act which contains such unrelated provisions must necessarily be held to be invalid in order to effectuate the purposes of the rule." Id. at 145, 11 OBR 436, 464 N.E.2d 153. Otherwise, we are left with the anomalous proposition that a bill containing more than one subject does not violate a constitutional provision that prohibits a bill from containing more than one subject.

{¶ 72} Moreover, petitioner's proposed test invites the evil it claims to avoid. It purports to be steeped in concerns of legislative autonomy and judicial noninterference, yet directs us to look beyond the four corners of a bill and inquire into the doings of legislators. By its own terms, this test requires that we perform the inherently legislative function of gauging the extent to which particular proposals are likely to generate political controversy or invoke political opposition, which is a kind of entanglement with the legislative process that far exceeds any legitimate judicial function.

{¶ 73} In any event, this is essentially the same argument that we recently rejected in State ex rel. Ohio Civ. Serv. Employees Assn. In that case, SERB contended that unlike the School Voucher Program struck down in Simmons–Harris, H.B. No. 405 was "not leading edge or controversial legislation." State ex rel. Ohio Civ. Serv. Employees Assn., 104 Ohio St.3d 122, 2004-Ohio-6363, 818 N.E.2d 688, ¶ 35. We responded, however, as follows:

{¶ 74} "Although the School Voucher Program is admittedly broader in scope and more progressive in objective than the amendment to R.C. 3318.31, the importance of the amendment to those affected by it, however few, cannot be doubted. We decline to adopt a rule that requires a correlation between the degree of legislative attention given to a statutory provision within a proposed bill and the number of people affected by it." Id.

IV

CONCLUSION

{¶ 75} For the foregoing reasons, we answer the certified question in the affirmative and hold that the inclusion of former R.C. 5301.234 in Am.Sub.H.B. No. 163 violates the one-subject rule of the Ohio Constitution. We therefore

sever former R.C. 5301.234 from Am.Sub.H.B. No. 163 and save the nonoffending provisions in the Act.

{¶ 76} Accordingly, we advise the federal court that former R.C. 5301.234 is unconstitutional under Ohio law.

Judgment accordingly.

MOYER, C.J., F.E. SWEENEY, PFEIFER and O'CONNOR, JJ., concur.

LUNDBERG STRATTON and O'DONNELL, JJ., dissent.

---

LUNDBERG STRATTON, J., dissenting.

{¶ 77} The majority's interpretation of the one-subject provision in Section 15(D), Article II of the Ohio Constitution as mandatory, not directory, ignores the intent of the drafters of our Constitution. Therefore, I respectfully dissent.

{¶ 78} As I stated in my dissenting opinions in *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062, and *State ex rel. Ohio Civ. Serv. Employees Assn., AFSCME, Local 11, AFL–CIO v. State Emp. Relations Bd.*, 104 Ohio St.3d 122, 2004-Ohio-6363, 818 N.E.2d 688, I believe that we should adhere to the intent of the framers of our Constitution that the one-subject rule be directory. Delegates at the 1873–1874 Ohio Constitutional Convention defeated a proposed amendment to make the rule mandatory. Delegates' remarks during the debate bear repeating. Delegate S.O. Griswold commented:

{¶ 79} "I am opposed to the adoption of this amendment, on the ground that it will lead to confusion and constant litigation of the question whether one subject is embraced in it or not. A subject of legislation may require various provisions, and men will be in doubt whether these different provisions come within the language of this clause. Under this general rule, the bill shall be made to express, by the title, all the provisions of the bill, and subjects of legislation have frequently such a wide range, and are so connected with other matters, that it is necessary, sometimes, to have your bill so enlarged that doubts will constantly be raised * * *." 2 Proceedings and Debates of the Third Constitutional Convention of Ohio (1874) 284–285.

{¶ 80} Another delegate, William W. West, stated:

{¶ 81} "[W]hat is a single subject, one subject? Take for example, the code of civil procedure. There is your title: a bill or an act to provide for a code of civil procedure. * * * Now, under that general title we may express that the general subject matter within that act is the civil practice; but there are an infinite number of subjects contained within that general subject, which might very properly be considered and regarded as distinct and different subjects matter

[sic]. You have a statute of limitation. True, that has a general relation to the subject of practice, but it is a very distinct thing from the organization of a jury, and a very distinct thing from the law of evidence; and yet, they are all embraced within the same act. Now if we put into the Constitution the provisions that no law shall contain more than one subject matter, may we not get into trouble and confusion about the matter? * * * Hence you will see that difficulties at once arise; so that under a statute of that kind it may be difficult to incorporate a great many subordinate subjects that have relation to the general subject. * * *

{¶ 82} "* * * There are general subjects of legislation, and there are subordinate subjects, cognate to the general subject, that are properly embraced in the same bill; and yet if you put this in, I fear very much, that they cannot be included." Id. at 291.

{¶ 83} Now a majority of this court has voted to amend that which the delegates defeated, concluding that the directory nature of the rule, combined with the ability to sever the portion of any enactment that violates it, is a "source of confusion." I do not agree. The rule was designed to prevent logrolling, not to guarantee commonality of subjects within a bill. However, if there is a "manifestly gross and fraudulent" violation, we must exercise our authority to strike down the enactment or sever the offending provision within it. *Pim v. Nicholson* (1856), 6 Ohio St. 176, 180. Although today's opinion pays lip service to the "manifestly gross and fraudulent" standard set forth in *Pim*, this court continues its slide down a slippery slope, using the one-subject rule with little consistency or reason to invalidate legislation.

{¶ 84} Recent decisions of this court, including today's opinion, "have opened the door for anyone to challenge any small provision in a bill if it fails to meet the high threshold of commonality between all the topics within the bill even if the bill is constitutional in all other aspects." *State ex rel. Ohio Civ. Serv. Employees Assn. v. State Emp. Relations Bd.*, 104 Ohio St.3d 122, 2004-Ohio-6363, 818 N.E.2d 688, ¶ 79 (Lundberg Stratton, J., dissenting). Now a challenger need not establish that a provision was a product of logrolling, just that its subject matter lacks a commonality with all other provisions in the enactment. As a result, today's opinion will hamper the legislative process. Any bill that contains a provision that does not meet this court's threshold of commonality is now susceptible to being struck down, whether or not it was the product of logrolling. Disgruntled parties will now be more likely to challenge the constitutionality of an enactment based on the one-subject rule when there are no other valid constitutional grounds to oppose it. To discourage these challenges, the General Assembly might feel compelled to divide multiple provisions relating to the same subject into separate bills, slowing the legislative process.

{¶ 85} Finally, I do not agree that Am.Sub.H.B. No. 163 violates the one-subject rule so that former R.C. 5301.234 must be severed from the enactment. And by severing former R.C. 5301.234, the majority now opens the door for a similar challenge to other provisions of Am.Sub.H.B. No. 163. I believe that *In re Stewart*, 96 Ohio St.3d 67, 2002-Ohio-3526, 771 N.E.2d 250, implicitly upheld the constitutionality of former R.C. 5301.234. Although *Stewart* answered a certified question about the statute's application, I believe that the decision implicitly recognized the statute's constitutionality.

{¶ 86} Therefore, I respectfully dissent.

O'DONNELL, J., concurs in the foregoing dissenting opinion.

———————

McFadden & Associates Co., L.P.A. and David A. Freeburg, for petitioner, PCFS Financial.

Weick, Gibson & Lowry and Michael J. Moran, for respondent, Lydia Spragin III, trustee.

Gregory W. Happ; Kegler, Brown, Hill & Ritter and John C. Deal; McDonald, Frank, Hitzeman & Holman and Robert B. Holman, in support of petitioner, for amici curiae, First Union National Bank, First Union Home Equity Bank, N.A., and Ohio Land Title Association.